HOWARD VINCENT ASHLEY, and All Those Similarly Situated, Plaintiff-Appellant, v. DONALD N. SNYDER, JR., Defendant-Appellee (William E. Boyd, Defendant).

Fourth District   No. 4—99—0712

Opinion filed October 19, 2000.—Rehearing denied November 21, 2000.

Howard Vincent Ashley, of Galesburg, for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Michael A. Rakov, Assistant Attorney General, of counsel), for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In April 1999, plaintiff, Howard Vincent Ashley, an inmate at Henry Hill Correctional Center (HHCC), filed a *pro se* complaint against defendant, Donald N. Snyder, the Director of the Illinois Department of Corrections (DOC), seeking to enjoin the implementation of a DOC regulation restricting the quantity of personal property an inmate could possess while incarcerated. Ashley's complaint alleged that the regulation violates numerous provisions of the United States and Illinois Constitutions, as well as several state and federal statutes.

In May 1999, Snyder filed a motion to dismiss the complaint for failure to state a cause of action (735 ILCS 5/2—615 (West 1998)) and a motion requesting a finding that Ashley's complaint was frivolous (730 ILCS 5/3—6—3(d)(1) (West 1998)). Following a hearing, the trial court dismissed Ashley's complaint and denied Snyder's motion for a finding that the complaint was frivolous.

Ashley appeals, arguing that the trial court erred by dismissing his complaint, and we affirm.

## I. BACKGROUND

In March 1999, prison officials at HHCC issued "Inmate Bulletin # 99—028" (hereafter the Bulletin), which provided that, beginning the following month, inmates would be required to keep most of their personal property in a storage box (measuring 11 inches high, $32\frac{1}{2}$ inches long, and $20\frac{1}{2}$ inches wide) at all times. Inmates could keep five of the following items in their cells even if they would not fit into a storage box: a fan, a television, an AM/FM radio, an AM/FM radio cassette player, a Walkman, a beard trimmer, an electric shaver, a calculator, a desk light, a hot pot, and a typewriter. Inmates would be required to dispose of all other personal property that would not fit into their storage boxes and would have 30 days in which to have the excess personal property (1) shipped out (at the inmate's expense), (2) picked up by a visitor, or (3) destroyed. The Bulletin further provided that inmates could also obtain a correspondence box, which would be used only to store legal materials, reading materials, and correspondence items.

In April 1999, Ashley filed a *pro se* complaint against Snyder and William E. Boyd, HHCC's chief administrative officer, seeking to enjoin implementation of the Bulletin. (Boyd was never served with the complaint, and he is not a party to this appeal.) Ashley's complaint alleged that implementation of the Bulletin (1) violates his right to due process of law, (2) constitutes an *ex post facto* enactment, (3) constitutes an unreasonable seizure under the fourth amendment (U.S. Const., amend. IV), (4) violates the eighth amendment's prohibition against cruel and unusual punishment (U.S. Const., amend. VIII), (5) violates the equal protection clause of the fourteenth amendment (U.S. Const., amend. XIV, § 1), (6) constitutes a breach of contract, (7) constitutes a conversion of his personal property, and (8) violates numerous state and federal statutes.

In July 1999, as previously stated, the trial court dismissed Ashley's complaint on Snyder's motion, and this appeal followed.

## II. ANALYSIS

### A. Standard of Review

■ The question presented by a motion under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1998)) to dismiss a complaint for failure to state a cause of action is whether the complaint sets forth sufficient facts which, if established, could entitle the plaintiff to relief. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86, 672 N.E.2d 1207, 1214 (1996). In ruling on such a motion, the trial court must accept all well-pleaded facts in the complaint as true and draw reasonable inferences from those facts that are favorable to the pleader. *Bryson*, 174 Ill. 2d at 86, 672 N.E.2d at 1213. The court should grant the motion only if the plaintiff can prove no set of facts that would support a cause of action. *Bryson*, 174 Ill. 2d at 86-87, 672 N.E.2d at 1214. Because this process does not require the trial court to weigh facts or determine credibility, a reviewing court does not defer to that court's decision but instead reviews the matter *de novo*. *Jackson v. Michael Reese Hospital & Medical Center*, 294 Ill. App. 3d 1, 9, 689 N.E.2d 205, 211 (1997).

### B. The Liberty Interest Claim

■ Ashley first argues that the HHCC inmate orientation manual, which prison officials issued prior to the Bulletin and which includes a list of the type and quantity of personal items inmates may possess, created a liberty interest, guaranteeing his right to keep his excess personal property in his cell. Thus, he contends that when prison officials implemented the Bulletin without conducting a hearing, they deprived him of his property without due process of law. We disagree.

In essence, Ashley argues that by setting forth the affirmative language of the HHCC inmate orientation manual, the state created a liberty interest in an inmate's right to keep certain enumerated items of personal property in his cell, which could not be taken away without due process of law. Under the methodology Ashley relies on, which was discussed approvingly in *Hewitt v. Helms*, 459 U.S. 460, 472, 74 L. Ed. 2d 675, 688, 103 S. Ct. 864, 871 (1983), courts look to mandatory language in statutes or regulations to determine whether the right in question rises to the level of one that can be withdrawn only by providing due process of law. The fundamental problem with Ashley's argument is that in *Sandin v. Conner*, 515 U.S. 472, 477-84, 132 L. Ed. 2d 418, 425-30, 115 S. Ct. 2293, 2297-300 (1995), the United States Supreme Court expressly rejected that methodology in the context of prison liberty interests. The Court held that states cannot create enforceable liberty interests in freedom from the routine deprivations and discomforts of prison life. While states "may under certain cir-

cumstances create liberty interests which are protected by the [d]ue [p]rocess [c]lause," "these interests will be generally limited to freedom from restraint which *** imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life." (Emphasis added.) *Sandin*, 515 U.S. at 484, 132 L. Ed. 2d at 429-30, 115 S. Ct. at 2300.

In *Parker v. DeTella*, No. 98—C—0644 (N.D. Ill. April 6, 1998) (1998 WL 164817) (unpublished memorandum opinion), the court was faced with an inmate's constitutional challenge to a similar Illinois prison regulation limiting the amount of personal property that an inmate could keep in a storage box in his cell. The court applied the *Sandin* analysis and rejected the inmate's claim, stating as follows:

> "Limitation of the kind and amount of property that one may have available is one of the incidents of prison life. *** Because the [regulation] does not impose atypical and significant hardship in relation to the ordinary incidents of prison life, it does not impact a protected liberty interest." *Parker*, No. 98—C—0644, slip op. at 5-6 (1998 WL 164817 at *3) (unpublished memorandum opinion).

We agree with *Parker*. Loss of access to possessions is an inevitable result of incarceration, and the Bulletin merely imposes a routine and insignificant inconvenience on inmates. It clearly does not impact a protected liberty interest. Thus, prison officials may—as a condition of confinement—establish rules and regulations that limit the type and quantity of personal property that an inmate may keep in his prison cell, and such rules and regulations do not infringe upon the inmate's constitutional rights.

## C. The Other Constitutional Claims

Ashley also argues that implementation of the Bulletin (1) constitutes an *ex post facto* enactment in violation of the Illinois Constitution (Ill. Const. 1970, art. I, § 16), (2) constitutes an unreasonable seizure under the fourth amendment, and (3) violates the eighth amendment's prohibition against cruel and unusual punishment. We disagree.

■ First, Ashley's claim that implementation of the Bulletin, which is a DOC administrative rule, would violate the *ex post facto* clause of the Illinois Constitution is baseless. The Illinois Constitution forbids the enactment of *ex post facto* penal *statutes* (*Fletcher v. Williams*, 179 Ill. 2d 225, 229, 688 N.E.2d 635, 638 (1997)); it simply does not apply to the enactment of administrative rules. Moreover, the *ex post facto* clause is aimed at laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43, 111 L. Ed. 2d 30, 39, 110 S. Ct. 2715, 2719 (1990); see also *Fletcher*, 179 Ill. 2d at 229, 688 N.E.2d at 638 (in interpreting the

*ex post facto* prohibition in the Illinois Constitution, courts look to the United States Supreme Court's interpretation of the federal prohibition). The Bulletin obviously does *not* effect any change in the definition of Ashley's crime or create any risk of increasing the punishment for his crime.

■ Second, Ashley cannot state a claim that implementation of the Bulletin constitutes an unreasonable seizure under the fourth amendment because the fourth amendment does not apply within prison cells. *Hudson v. Palmer*, 468 U.S. 517, 526-28, 82 L. Ed. 2d 393, 402-04, 104 S. Ct. 3194, 3200-01 (1984); see *Bell v. Wolfish*, 441 U.S. 520, 537, 60 L. Ed. 2d 447, 467, 99 S. Ct. 1861, 1873 (1979) ("Loss of freedom of choice and privacy are inherent incidents of confinement ***"); see also *Parker*, No. 98—C—0644, slip op. at 4 (1998 WL 164817 at *2) (unpublished memorandum opinion).

●5 Finally, implementation of the Bulletin does not violate the eighth amendment's prohibition against cruel and unusual punishment. A prison official violates the eighth amendment only when (1) the deprivation alleged is "sufficiently serious" under an objective standard (*Wilson v. Seiter*, 501 U.S. 294, 298, 115 L. Ed. 2d 271, 278-79, 111 S. Ct. 2321, 2324 (1991)); and (2) the official's act or omission results in the denial of "the minimal civilized measure of life's necessities" (*Rhodes v. Chapman*, 452 U.S. 337, 347, 69 L. Ed. 2d 59, 69, 101 S. Ct. 2392, 2399 (1981)). See *Farmer v. Brennan*, 511 U.S. 825, 837, 128 L. Ed. 2d 811, 825, 114 S. Ct. 1970, 1979 (1994) ("a prison official cannot be found liable under the [e]ighth [a]mendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety"); see also *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) ("the routine discomfort inherent in the prison setting is inadequate to satisfy the [first] prong of an [e]ighth [a]mendment inquiry"). Under this inquiry, implementation of the Bulletin clearly does not violate the eighth amendment. Limiting the amount of property inmates may keep in their cells is nothing more than "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347, 69 L. Ed. 2d at 69, 101 S. Ct. at 2399.

### D. The Statutory Claims

■ Last, Ashley contends that implementation of the Bulletin would violate several state and federal statutes, including the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1998)), section 3—4—3 of the Unified Code of Corrections (Unified Code) (730 ILCS 5/3—4—3 (West 1998)), and the Fair Trade Commission Act (15 U.S.C. § 45 (1994)). Specifically, he

claims that (1) by purchasing items from the prison's commissary he entered into "numerous contractual agreements" with DOC officials; and (2) he "has been fleeced *** via the [Bulletin's] implementation."

We agree with Snyder that none of the statutes Ashley relies upon are relevant to his contention that implementation of the Bulletin deprives him of a right to retain certain items of personal property in his cell. Simply put, nothing in those statutes grants Ashley the right to keep personal property in his cell. In particular, section 3—4—3 of Unified Code, which requires DOC to "record and receipt all personal property not allowed to committed persons" and return the property "no later than the person's release on parole" (730 ILCS 5/3—4—3 (West 1998)), does not mandate that an inmate be allowed access to his property while incarcerated or that such property remain at the prison where the inmate is incarcerated.

For the foregoing reasons, we hold that the trial court did not err by dismissing Ashley's complaint for failure to state a cause of action.

### III. EPILOGUE

In so holding, we note that this sort of "prisoner's rights" case depletes the resources of prosecutors, the judiciary, and DOC, and unnecessarily diverts DOC's attention from ensuring that prisoners are granted their genuine rights. Prison regulations, such as those contained in the inmate orientation manual relied on here, were *never* intended to confer rights on inmates or serve as a basis for constitutional claims. *Sandin*, 515 U.S. at 482, 132 L. Ed. 2d at 428, 115 S. Ct. at 2299. Instead, Illinois DOC regulations, as well as the Unified Code, were designed to provide guidance to prison officials in the administration of prisons. In addition, Illinois law creates no more *rights* for inmates than those which are constitutionally required.

As earlier discussed, states cannot confer upon prisoners enforceable liberty interests in avoiding the routine deprivations and discomforts of prison life. Under the mandate of *Sandin*, states may create liberty interests which are protected by the due process clause *only* when state law "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 132 L. Ed. 2d at 430, 115 S. Ct. at 2300.

The Constitution does not require that prisons be comfortable (*Rhodes*, 452 U.S. at 349, 69 L. Ed. 2d at 70, 101 S. Ct. at 2400), only that they supply basic human needs (*Farmer*, 511 U.S. at 832, 128 L. Ed. 2d at 822, 114 S. Ct. at 1976). Inmates thus have a constitutional right to adequate shelter, food, drinking water, clothing, sanitation, medical care, and personal safety. See *Farmer*, 511 U.S. at 832, 128 L. Ed. 2d at 822, 114 S. Ct. at 1976; see also *Johnson*, 217 F.3d at 731.

Prisoners also have a reasonable right of access to courts and a right to a reasonable opportunity to exercise religious freedom under the first amendment. See *Hudson*, 468 U.S. at 523, 82 L. Ed. 2d at 401, 104 S. Ct. at 3198. Beyond these, prisoners possess no other rights, only privileges.

However, as the Supreme Court in *Sandin* pointed out, the now-defunct *Hewitt* methodology has encouraged prisoners, as Ashley here, to comb through prison regulations and state statutes in search of mandatory language on which to base their purported "rights." *Sandin*, 515 U.S. at 481, 132 L. Ed. 2d at 428, 115 S. Ct. at 2299; see, *e.g., Segal v. Biller*, No. 94—35448 (9th Cir. October 31, 1994) (unpublished decision affirming unpublished district court decision) (1994 U.S. App. LEXIS 30628) (claiming liberty interest in a waiver of the travel limit imposed on prison furloughs); *Burgin v. Nix*, 899 F.2d 733, 734 (8th Cir. 1990) (claiming liberty interest in receiving a tray lunch rather than a sack lunch). The *Hewitt* approach also led courts to inject themselves deeply in the day-to-day management of prisons and to second-guess what are essentially prison managerial decisions. See, *e.g., Spruytte v. Walters*, 753 F.2d 498, 507 (6th Cir. 1985), quoting Mich. Admin. Code r. 791.6603 (finding liberty interest in receiving a paperback dictionary due to a rule that prisoners " 'may receive any book ... which does not present a threat to the order or security of the institution' "; *United States v. Michigan*, 680 F. Supp. 270, 277 (W.D. Mich. 1988) (finding liberty interest in not being placed on a food loaf diet).

In light of these two undesirable trends, states have become disinclined to codify prison management procedures for fear of becoming even more vulnerable to prisoners' constitutional claims. See *Sandin*, 515 U.S. at 482, 132 L. Ed. 2d at 428, 115 S. Ct. at 2299. As a further unintended consequence, prison officials' ability to manage the volatile prison environment has been hampered, resulting all too often in their failure to ensure that a prisoner's most important right—the right to be free from violence and terror at the hands of other inmates—is not violated.

The state must be given an incentive to develop and implement prison regulations that provide prison officials and staff with specific guidelines to deal with prison safety concerns. The more authority prison officials have and the more discipline they are allowed to mete out quickly and efficiently (without fear of becoming vulnerable to constitutional claims), the less likely inmate violence will remain the norm. See, *e.g.,* B. Kerik, *Accountability: The key to staff safety*, 62: No. 4 Corrections Today, 35, 38 (July 1, 2000) (1998 WL 16487) (inmate-on-inmate violence in the New York City Department of Cor-

rections decreased after introduction of "a tough, new rearrest policy" throughout the department; the author, who is the commissioner of the department, noted that if inmates "are allowed to assault one another without consequences, then that becomes part of who they are." On the other hand, if they "receive a clear message that violence will not be tolerated, their behavior will change").

In light of the Supreme Court's decision in *Sandin*, prison officials, including those with Illinois DOC, should feel confident that they can codify their prison management procedures and design and implement rules and regulations without fear of being vulnerable to constitutional claims based on the language of a particular regulation. As long as prison officials ensure that inmates have the things to which they are constitutionally entitled, such as personal safety, adequate shelter, and reasonable access to the courts, prison officials *may* impose constraints upon inmates that are otherwise "arbitrary." Although "the state does not strip bare [a prisoner's] right to be free of the arbitrary and purposeless use of authority," "the purpose of incarceration *** circumscribes a prisoner's rights against the abuse of power more tightly than a free man's or woman's." *Leslie v. Doyle*, 125 F.3d 1132, 1136 (7th Cir. 1997). The due process clause has sometimes been considered a shield against the arbitrary exercise of governmental power. However, the court in *Leslie* suggested that, apart from a protected liberty interest, there is no content to such "substantive due process" in the prison context. *Leslie*, 125 F.3d at 1136. We agree with *Leslie*'s suggestion and hold that, other than a protected liberty interest, no substantive due process right exists in the prison context.

## IV. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

MYERSCOUGH and KNECHT, JJ., concur.