THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSHUA R. CALVERT, Defendant-Appellant.

Fourth District No. 4—00—0443

Opinion filed December 11, 2001.

415

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Barney S. Bier, State's Attorney, of Quincy (Norbert J. Goetten, Robert J.

Biderman, and Raymond J. Cicci, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In November 1999, the State charged defendant, Joshua R. Calvert, with aggravated battery (of a police officer) (count I), possession of a controlled substance (less than 15 grams of a substance containing methamphetamine) (count II), and resisting a police officer (count III) (720 ILCS 5/12—4(b)(6) (West 1998); 720 ILCS 570/402(c) (West 1998); 720 ILCS 5/31—1 (West 1998)). In March 2000, a jury found defendant guilty of counts II and III and not guilty of count I.

Following an April 2000 sentencing hearing, the trial court sentenced defendant to an extended term of four years in prison on count II, based on his prior felony convictions (730 ILCS 5/5—5—3.2(b)(1) (West 1998)), and 10 months in prison on count III, with those sentences to run concurrently. The court also ordered that (1) defendant pay $1,930.30 in various fees, fines, and court costs, and (2) the Department of Corrections (DOC) withhold 50% of defendant's DOC wages and remit those funds to the Adams County circuit clerk to be applied toward the amounts due in fines and costs.

Defendant appeals, arguing that (1) the trial court (a) committed plain error by allowing the State to impeach him with his prior aggravated battery conviction without first conducting the *Montgomery* balancing test (see *People v. Montgomery*, 47 Ill. 2d 510, 516, 268 N.E.2d 695, 698 (1971)), and (b) erred by denying his motion to suppress the evidence that was found during an allegedly unlawful strip search of defendant; (2) the extended-term sentencing provision set forth in section 5—5—3.2(b)(1) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5—5—3.2(b)(1) (West 1998)) is unconstitutional pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2362-63 (2000); and (3) the trial court lacked the authority to order that his DOC wages be withheld and remitted to the circuit clerk. Alternatively, defendant argues that he received ineffective assistance of trial counsel when counsel failed to (1) object to the trial court's allowing the State to impeach him with his prior aggravated battery conviction without first conducting the *Montgomery* balancing test, and (2) specifically include in the motion to suppress evidence the claim that police officers unlawfully strip-searched defendant. We affirm in part, vacate in part, and remand with directions.

# I. BACKGROUND

## A. Pretrial Proceedings

In November 1999, the State charged defendant with aggravated battery of a police officer, possession of a controlled substance (less than 15 grams of a substance containing methamphetamine), and resisting a police officer.

In December 1999, defendant filed a motion to suppress evidence, alleging the following: (1) during the early morning hours of November 17, 1999, Quincy police officers stopped defendant in his truck; (2) the officers lacked probable cause to stop him; and (3) the evidence obtained by the officers as a result of the unlawful stop and subsequent search of defendant's person should have been suppressed. At a February 2000 hearing on defendant's motion, Quincy police officer Gabriel Vanderbol testified that at around 2:40 a.m. on November 17, 1999, he and Officer Anjanette Stovall saw a truck without a registration plate light traveling on 8th Street in Quincy. Vanderbol activated the light bar on his squad car and pulled the truck over. Vanderbol then approached the driver of the truck (later identified as defendant) and told him the reason for the stop. Defendant told Vanderbol that he had just purchased the truck.

Vanderbol then informed defendant that the computer check of the truck's license plates showed that the registration was suspended for lack of insurance. He asked defendant to shut off the engine and step to the rear of the truck, but defendant "just sat there." Stovall opened the passenger-side door and told defendant to get out of the truck, at which point defendant got out and walked to the rear of the truck. Defendant asked why he was under arrest, and Vanderbol again advised him that the registration was suspended. Defendant said he did not understand and showed Vanderbol his proof of insurance. Before Vanderbol could say anything else, defendant hit him in the face.

After hitting Vanderbol, defendant attempted to run away, but Vanderbol grabbed his shirt and jumped on him, knocking him to the ground. Stovall and Jeff Nevin, another police officer who arrived following the stop, then assisted Vanderbol in handcuffing defendant. The officers transported defendant to the Adams County jail, where a correctional officer strip-searched defendant and found a small bag containing a brown leafy substance in defendant's underwear. (Inside the bag, the officers found a smaller bag, which contained a white powdery substance, later determined to be 2.3 grams of methamphetamine.)

After considering the evidence and counsel's arguments, the trial court denied defendant's motion to suppress evidence.

## B. Defendant's Trial

At defendant's March 2000 jury trial, Vanderbol's testimony was substantially consistent with his testimony at the hearing on the motion to suppress. In addition, Vanderbol stated that after he handcuffed defendant, he conducted a pat-down search but found nothing. He then placed defendant in his squad car and transported him to the Adams County jail. Vanderbol explained that officers routinely transport arrestees to the jail, instead of police headquarters, when they have been combative during an arrest. Although Vanderbol was present during the strip search of defendant, he did not participate in the search.

Stovall's testimony substantially corroborated Vanderbol's version of the incident. However, she acknowledged that she did not actually see defendant's fist make contact with Vanderbol's face. After transporting defendant to the jail, Stovall stood outside a holding cell while a male correctional officer strip-searched defendant.

Nevin's testimony also substantially corroborated Vanderbol's version of the incident. During the strip search, Nevin stood at the door of the holding cell while a male correctional officer conducted the search. Vanderbol and Stovall stood behind him in the hallway.

Dan Steinway, an Adams County correctional officer, testified that whenever an arrestee is going to be incarcerated at the jail, a correctional officer conducts a strip search to check for contraband and weapons. After the police officers brought defendant to the jail on the morning of the incident, Steinway and another male correctional officer took defendant into a holding cell and conducted a strip search. During the strip search, defendant first took off his shirt, shoes, and pants and handed them to the correctional officers, who inspected the clothing. As defendant was pulling down his underwear, Steinway saw a small plastic bag in the "crotch of his underwear." At Steinway's request, defendant handed him the bag.

Defendant testified on his own behalf and denied hitting Vanderbol. He stated that after Vanderbol and Stovall pulled him over and he stepped out of his truck, one of the officers grabbed his arm and he pulled away. At that point, other officers knocked him down and beat him up. Defendant also denied having a plastic bag in his underwear during the strip search.

Based on this evidence, the jury (1) found defendant guilty of possession of a controlled substance (less than 15 grams of a substance containing methamphetamine) and resisting a police officer and (2) acquitted him of aggravated battery. The trial court later sentenced him as stated.

This appeal followed.

## II. ANALYSIS

### A. Impeachment with Defendant's Prior Aggravated Battery Conviction

*1. Defendant's Claim That the Trial Court Erred by Allowing the State To Impeach Him with His Prior Aggravated Battery Conviction*

Defendant first argues that the trial court committed plain error by allowing the State to impeach him with his prior aggravated battery conviction. Specifically, he contends that the court erred by not recognizing its obligation to conduct the *Montgomery* balancing test to determine if the probative value of the conviction was substantially outweighed by the danger of unfair prejudice (*Montgomery*, 47 Ill. 2d at 516, 268 N.E.2d at 698). We disagree.

■ Parties who agree to the admission of evidence through a stipulation are estopped from later complaining about that evidence being stipulated into the record. *People v. Baynes*, 88 Ill. 2d 225, 239, 430 N.E.2d 1070, 1076 (1981); see also *People v. Early*, 158 Ill. App. 3d 232, 239, 511 N.E.2d 847, 852 (1987) (stipulations should be construed to give effect to the parties' intentions, and such stipulations are "binding and conclusive on the parties"); *People v. Williams*, 192 Ill. 2d 548, 571, 736 N.E.2d 1001, 1014 (2000) ("A criminal defendant cannot complain on appeal of the introduction of evidence which he procures or invites").

In this case, at the close of evidence and outside the jury's presence, the following colloquy occurred:

"THE COURT: Back on record, ladies and gentlemen, I misspoke. Counsel did have a further stipulation that I would permit [the prosecutor] to proceed with and then hear if that is in fact the agreement. Go ahead.

[THE PROSECUTOR]: Your Honor, the stipulation would be, as far as the People presenting an [e]xhibit No. 4, defendant having an aggravated battery conviction out of Adams County filed November 3rd of 1994. The conviction was entered March 31st of 1995.

THE COURT: [Defense counsel]?

[DEFENSE COUNSEL]: That's correct, your Honor.

THE COURT: And that is received pursuant to stipulation by the parties."

Thus, defendant, through his counsel, stipulated to the admission of his prior aggravated battery conviction for impeachment purposes. Accordingly, that stipulation is binding and conclusive, and defendant cannot now complain about the trial court's decision to allow the State to impeach him with his prior conviction.

■ Defendant concedes that he stipulated to the admission of his prior conviction for impeachment purposes. Nonetheless, he claims that the trial court erred by making "no effort to conduct any balancing test whatever." We emphatically reject defendant's suggestion that the trial court must conduct the *Montgomery* balancing test when the parties have stipulated to the admission of the defendant's prior conviction for impeachment purposes. A stipulation is "an agreement between parties or their attorneys with respect to business before a court" (*People v. Buford*, 19 Ill. App. 3d 766, 770, 312 N.E.2d 796, 799 (1974)), and courts look with favor upon stipulations because " 'they tend to promote disposition of cases, simplification of issues[,] and the saving of expense to litigants' " (*People v. Coleman*, 301 Ill. App. 3d 37, 48, 704 N.E.2d 690, 698 (1998), quoting *In re Estate of Moss*, 109 Ill. App. 2d 185, 192, 248 N.E.2d 513, 516 (1969)). The only matters to which parties cannot stipulate are (1) the results of polygraph examinations (see *Baynes*, 88 Ill. 2d at 239, 430 N.E.2d at 1076) and (2) the waiver of a presentence report (see 730 ILCS 5/5—3—1 (West 1998)). In all other situations, parties may enter into stipulations, and such stipulations are binding and conclusive on the parties. See, *e.g.*, *Buford*, 19 Ill. App. 3d at 769, 312 N.E.2d at 799, quoting *People v. Polk*, 19 Ill. 2d 310, 315, 167 N.E.2d 185, 188 (1960) (" 'an accused may, by stipulation, waive the necessity of proof of all or part of the [State's] case' " against him). Parties will not be relieved from a stipulation absent " 'a clear showing that the matter stipulated is untrue, and then only when the application is seasonably made.' " *Coleman*, 301 Ill. App. 3d at 48, 704 N.E.2d at 698, quoting *Brink v. Industrial Comm'n*, 368 Ill. 607, 609, 15 N.E.2d 491, 492 (1938). Defendant does not contend—nor could he—that the matter stipulated to (that is, his prior conviction) was untrue.

In light of the foregoing principles, defendant, through his counsel, and the State clearly could stipulate to the admission of defendant's prior aggravated battery conviction for impeachment purposes. To require the trial court to apply the *Montgomery* balancing test in this situation would negate the entire purpose behind stipulations and would make no sense.

## 2. *Defendant's Claim That He Was Denied Effective Assistance of Trial Counsel*

Alternatively, defendant argues that he was denied effective assistance of trial counsel in that his counsel failed to object when the trial court allowed the State to impeach him with his prior aggravated battery conviction and stipulated to the admission of that prior conviction. Specifically, he contends that (1) no conceivable legitimate trial

strategy would support counsel's failure to object; and (2) counsel's failure to object severely prejudiced him.

 Ineffective assistance of counsel claims are judged under the now familiar standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). To establish ineffective assistance of counsel, a defendant must first demonstrate that his defense counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the [s]ixth [a]mendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. In so doing, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. Second, a defendant must demonstrate a reasonable probability that, but for defense counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Both prongs of the *Strickland* test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel. *People v. Coleman*, 183 Ill. 2d 366, 397-98, 701 N.E.2d 1063, 1079 (1998).

In *People v. Kunze*, 193 Ill. App. 3d 708, 726, 550 N.E.2d 284, 296 (1990), this court held that adjudication of a claim of ineffective assistance of counsel is often better made in proceedings on a petition for postconviction relief, where a complete record can be made. In *Kunze*, the ineffective assistance of counsel claim turned on whether the defendant would have testified had he known in advance that the State would use his prior convictions to impeach him. *Kunze*, 193 Ill. App. 3d at 725, 550 N.E.2d at 296. Because nothing in the record permitted such a determination to be made, this court declined to adjudicate defendant's claim. *Kunze*, 193 Ill. App. 3d at 725-26, 550 N.E.2d at 296.

 Similarly, in this case, the record contains nothing to review with respect to why defense counsel stipulated to the State's use of defendant's prior aggravated battery conviction for impeachment purposes—that is, (1) why counsel chose to stipulate to the admission of defendant's prior conviction; and (2) whether counsel's decision to so stipulate constituted a trial tactic or incompetence. Because the answers to the questions pertinent to defendant's claim are currently *dehors* the record, we decline to consider them. Instead, defendant may pursue his claim under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 through 122—8 (West 1998)). See *People v. Holloman*, 304 Ill. App. 3d 177, 186, 709 N.E.2d 969, 975 (1999) (in which

this court reaffirmed our decision in *Kunze* and declined to address on direct appeal whether trial counsel's failure to make a motion to suppress evidence constituted ineffective assistance); *People v. Flores*, 231 Ill. App. 3d 813, 827-28, 596 N.E.2d 1204, 1213-14 (1992) (held, without an explanation from trial counsel, reviewing court cannot determine whether trial counsel's omissions involved the exercise of judgment, discretion, or trial tactics, which are not reviewable matters; recommended postconviction petition as a better forum for adjudication of ineffective assistance claim); *In re Carmody*, 274 Ill. App. 3d 46, 56, 653 N.E.2d 977, 984 (1995) (noting that the record on direct appeal of a criminal case rarely contains any explanation of the tactics of trial counsel, and holding that, if those tactics are to be the subject of scrutiny, a record should be developed in which they can effectively be reviewed).

## B. The Strip Search of Defendant

### 1. *Defendant's Claim That the Trial Court Erred by Denying His Motion To Suppress*

Defendant also argues that the trial court erred by denying his motion to suppress the evidence that the correctional officers found during their strip search of defendant at the county jail. Specifically, he contends that the strip search was unreasonable and violated his constitutional rights because the officers had no reasonable suspicion or probable cause to believe that he was concealing contraband or weapons on his person. We disagree.

In *Bell v. Wolfish*, 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979), detainees of a federally operated short-term detention facility filed a class action lawsuit challenging the constitutionality of numerous conditions of confinement and related administrative practices. The facility was primarily used to house persons who had been charged with crimes but not yet brought to trial. *Bell*, 441 U.S. at 523, 60 L. Ed. 2d at 458, 99 S. Ct. at 1865-66. In particular, the lawsuit challenged the practice of submitting inmates to a strip search and visual inspection of their body cavities after every contact visit with someone from outside the facility. See *McCloud v. Commonwealth*, 35 Va. App. 276, 282, 544 S.E.2d 866, 868-69 (2001) (a strip search generally refers to an inspection of a naked individual, without any scrutiny of his body cavities, while a visual body-cavity search extends to a visual inspection of the anal and genital areas). In exploring the scope of permissible searches incident to pretrial detention, the United States Supreme Court began by discussing the following general principles, which the Court's prior cases had established and which informed its analysis: (1) pretrial detainees, who have not been convicted of any

crimes, retain at least those constitutional rights that are enjoyed by convicted prisoners, such as freedom of speech and religion; (2) "[a] detainee simply does not possess the full range of freedoms of an unincarcerated individual" (*Bell*, 441 U.S. at 546, 60 L. Ed. 2d at 473, 99 S. Ct. at 1878); (3) "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees" (*Bell*, 441 U.S. at 546, 60 L. Ed. 2d at 473, 99 S. Ct. at 1878); and (4) because the problems that arise in the daily operation of a corrections facility are not susceptible to easy solutions, prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" (*Bell*, 441 U.S. at 547, 60 L. Ed. 2d at 474, 99 S. Ct. at 1878).

■ The Supreme Court in *Bell* ultimately held that under the circumstances, the strip searches and visual inspections of the detainees' body cavities were not unreasonable under the fourth amendment, and, instead, were "reasonable responses *** to legitimate security concerns." *Bell*, 441 U.S. at 561, 60 L. Ed. 2d at 483, 99 S. Ct. at 1886. In so holding, the Court stated, in pertinent part, as follows:

"Admittedly, this practice instinctively gives us the most pause. However, assuming for present purposes that inmates, both convicted prisoners and pretrial detainees, retain some [f]ourth [a]mendment rights upon commitment to a corrections facility, [citations], we nonetheless conclude that these searches do not violate that [a]mendment. The [f]ourth [a]mendment prohibits only unreasonable searches, [citation], and under the circumstances, we do not believe that these searches are unreasonable.

The test for reasonableness under the [f]ourth [a]mendment is not capable of precise definition or mechanical application. In each case[,] it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider [(1)] the scope of the particular intrusion, [(2)] the manner in which it is conducted, [(3)] the justification for initiating it[,] and [(4)] the place in which it is conducted. [Citations.] A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell*, 441 U.S. at 558-59, 60 L. Ed. 2d at 481, 99 S. Ct. at 1884.

■ In this case, following defendant's full custodial arrest for aggravated battery and resisting a police officer, the officers took him to the Adams County jail, where he was to be placed among the general jail population. At that point, defendant was subject to those measures

adopted for the maintenance of internal security at the jail. Thus, his position was no different, for constitutional purposes, from the pretrial detainees in *Bell*. If anything, the detainees in that case were subject to more onerous conditions, given the greater intrusiveness of a body-cavity search. As discussed above, the Supreme Court nevertheless upheld such searches "in the light of the central objective of prison administration, safeguarding institutional security." *Bell*, 441 U.S. at 547, 60 L. Ed. 2d at 473, 99 S. Ct. at 1878.

The two male correctional officers conducted the strip search of defendant in a holding cell, and defendant was allowed to remove his own clothes and hand them to the officers. The correctional officers inspected defendant's items of clothing as he removed them and then looked inside his underwear as he began removing it. The officers did not touch defendant's body or conduct a visual body-cavity search. In light of the substantial need to ensure institutional security, good penal practices not only permit, they require strip searches before placing detainees into the general jail population. Under these circumstances, we conclude that the justification for the strip search far outweighed its invasiveness. Thus, the strip search of defendant was reasonable and constitutional. Indeed, if correctional officers failed to conduct such searches prior to placing detainees into the general jail population, other inmates as well as correctional officers could be at serious risk. See *Ashley v. Snyder*, 316 Ill. App. 3d 1252, 1259, 739 N.E.2d 897, 903 (2000) (where this court wrote that a prisoner's most important right was "the right to be free from violence and terror at the hands of other inmates"). Depriving jail and prison administrators of the power to conduct strip searches like that conducted in the present case would seriously impede such administrators as they attempted to protect their inmate populations.

Defendant cites decisions of federal circuit courts of appeal holding that strip and visual body-cavity searches must be justified by at least a reasonable suspicion that the pretrial detainee is concealing contraband or weapons. See, *e.g.*, *Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 1997); *Kennedy v. Los Angeles Police Department*, 901 F.2d 702, 705 (9th Cir. 1989). However, those decisions do not control our decision in this case. Because federal courts do not exercise appellate jurisdiction over state courts, this court is not bound to follow decisions by federal courts other than the United States Supreme Court. See *Prior Plumbing & Heating Co. v. Hagins*, 258 Ill. App. 3d 683, 688, 630 N.E.2d 1208, 1212 (1994).

Because we have concluded that the strip search of defendant was a reasonable search incident to defendant's placement among the general jail population, we need not address whether the search was also

lawful incident to defendant's custodial arrest. See *People v. Seymour*, 84 Ill. 2d 24, 38, 416 N.E.2d 1070, 1075 (1981) (holding that a strip search at a police station, which was conducted incident to a custodial arrest, was reasonable where the defendant had been arrested on a misdemeanor weapons offense and there existed a "potential for danger inherent in the custodial arrest").

### 2. *Defendant's Claim That He Was Denied Effective Assistance of Trial Counsel*

■ Alternatively, defendant argues that he received ineffective assistance of trial counsel when his counsel failed to "adequately include" the strip-search issue in defendant's motion to suppress evidence. In light of our conclusion that the strip search of defendant was reasonable and constitutional, counsel's inclusion of that issue in defendant's motion to suppress would have been futile. Thus, even accepting defendant's contention that his counsel failed to adequately address the strip-search issue in the motion to suppress, we conclude that counsel's failure did not establish incompetent representation. See *People v. Robinson*, 299 Ill. App. 3d 426, 435, 701 N.E.2d 231, 240 (1998) ("trial counsel's failure to file a motion to suppress does not establish incompetent representation, especially when that motion would be futile").

### 3. *Defendant's Claim That the Strip Search Did Not Comport with Illinois Law*

■ Defendant also argues that the strip search did not comport with Illinois law. Specifically, he contends that the correctional officers did not comply with (1) section 103—1(e) of the Code of Criminal Procedure of 1963 (Procedural Code), which provides that a strip search be conducted by an officer who is the same sex as the person being searched; and (2) section 103—1(f) of the Procedural Code, which provides that an officer (a) obtain written permission from a commander before conducting a strip search and (b) prepare a written report following the search. 725 ILCS 5/103—1(e), (f) (West 1998).

Defendant has forfeited this argument on appeal by failing to raise it in the trial court or in a posttrial motion. *People v. Davis*, 319 Ill. App. 3d 572, 576, 746 N.E.2d 758, 762 (2001). Moreover, to the extent defendant claims that the alleged violations of sections 103—1(e) and (f) of the Procedural Code render the search a violation of his fourth amendment rights under the United States Constitution, we reject defendant's contention on the merits. Assuming for the purpose of argument that a search violates section 103—1 of the Procedural Code, that fact does not mean that the search also violates the United States Constitution. We agree with the Seventh Circuit Court of Ap-

peals that "just because Illinois chooses to regulate police behavior in a certain way does not mean the police officers violate the Constitution by transgressing those rules." *Doe v. Burnham*, 6 F.3d 476, 480 (7th Cir. 1993). The proper inquiry remains whether defendant's constitutional rights were violated.

## C. Constitutionality of Section 5—5—3.2(b)(1) Under *Apprendi*

■■ Defendant next argues that the enhanced sentencing provision of section 5—5—3.2(b)(1) of the Unified Code (730 ILCS 5/5—5—3.2(b)(1) (West 1998)) is unconstitutional under *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. We disagree.

In *People v. Dillard*, 319 Ill. App. 3d 102, 109, 745 N.E.2d 185, 191 (2001), we addressed and rejected this same argument. We adhere to our holding in *Dillard* and thus reject defendant's contention that *Apprendi* renders unconstitutional section 5—5—3.2(b)(1) of the Unified Code.

## D. Wage Withholding Order

■ Last, defendant argues that the trial court lacked the authority to order that his DOC wages be withheld and remitted to the circuit clerk. The State concedes that the court lacked the authority to enter such an order, and we accept the State's concession.

In *People v. Watson*, 318 Ill. App. 3d 140, 142-43, 743 N.E.2d 147, 149 (2000), this court held that no authority exists for a trial court to direct that DOC withhold wages earned while a defendant is imprisoned. See also *People v. Williamson*, 319 Ill. App. 3d 891, 900, 747 N.E.2d 26, 34 (2001) (reaffirming our decision in *Watson*). We adhere to *Watson* and *Williamson*. Accordingly, we vacate that portion of the trial court's sentencing order directing DOC to withhold 50% of defendant's DOC wages and remand with directions to modify the written judgment of sentence as stated.

## III. CONCLUSION

For the reasons stated, we affirm defendant's conviction and sentence, vacate that portion of the trial court's sentencing order directing DOC to withhold 50% of defendant's DOC wages, and remand with directions to modify the written judgment of sentence as stated.

Affirmed in part and vacated in part; cause remanded with directions.

McCULLOUGH and KNECHT, JJ., concur.