# Illinois Official Reports

## Appellate Court

***People v. Daniels*, 2016 IL App (4th) 140131**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEANDRE D. DANIELS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-14-0131 |
| Filed<br>Rehearing denied | August 4, 2016<br>August 24, 2016 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 12-CF-1193; the Hon. Robert L. Freitag, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and John M. McCarthy (argued), all of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Julia Kaye Wykoff (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Harris and Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1        On November 5, 2012, Robert Jackson was shot in the leg after an altercation between members of two rival rap groups, Money Over Bitches (M.O.B.) and Blackout Mafia (B.O.M.). The State later charged defendant, Deandre D. Daniels, with attempt (murder), aggravated battery with a firearm, aggravated discharge of a firearm, possession of a firearm by a street gang member (which the State later dropped), and unlawful possession of a weapon by a felon. In November 2013, a jury found defendant guilty of all four counts. The trial court later sentenced him to 47 years in prison.

¶ 2        Defendant appeals, raising the following issues: (1) the trial court abused its discretion by denying defendant's motion that the court question potential jurors about their gang bias, (2) the court abused its discretion by admitting specific acts of violence that occurred between the two groups, (3) the court abused its discretion by admitting evidence that defendant was visited in jail by his codefendants, (4) counsel was ineffective for failing to move to sever the charge of unlawful possession of a weapon by a felon, and (5) the evidence was insufficient to prove that defendant personally discharged a firearm that caused great bodily harm or permanent disfigurement. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Our review of the record indicates that some people are referred to by their birth names and others by their nicknames, depending on the witness testifying. In the interest of clarity, in situations in which the evidence clearly established that a nickname belonged to a particular person, we refer to the person by his or her birth name, even if the witness testifying used a nickname. In particular, we have made the following substitutions: defendant (nicknamed "Pimp"); Marcus Winlow (nicknamed "Li'l Dude"); and Kaythiese Fitch ("K.K.").

¶ 5                            A. The Charges Against Defendant

¶ 6        In November 2012, the State charged defendant with attempt (murder) (720 ILCS 5/8-4, 9-1 (West 2010)), aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2010)), aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2010)), possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2010)), and unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2010)). The charges alleged that on November 5, 2012, defendant used a firearm to shoot Jackson in the leg.

¶ 7                            B. The Parties' Pretrial Motions
¶ 8                    1. *The State's Motion To Admit "Other[-]Crimes" Evidence*
¶ 9        In October 2013, the State filed a motion *in limine*, asking the trial court to "permit evidence of other crimes and bad acts relating to rival groups [M.O.B.] and [B.O.M.] to be admitted at trial." Specifically, the motion sought to admit the following evidence, in relevant part: (1) that M.O.B. and B.O.M. were "rival groups that produce rap music," (2) testimony from codefendant Jake Williams about prior acts of violence between M.O.B. and B.O.M. members, and (3) testimony from codefendant Raymond Davis about the altercations between M.O.B. and B.O.M. members that occurred on November 5, 2012. The State argued that the aforementioned evidence was necessary to establish (1) "the continuing narrative of the events

giving rise to and intertwined with the offenses charged" and (2) "the relationship and familiarity of the parties."

¶ 10          2. *The State's Motion To Introduce Evidence That Defendant's Codefendants Visited Him in Jail After His Arrest*

¶ 11      Later that month, the State filed a second motion *in limine*, asking to introduce evidence that after the alleged offenses in this case, defendant's three codefendants visited him in jail. The State argued that the evidence was relevant to establish defendant's guilt on a theory of accountability.

¶ 12          3. *Defendant's Motion To Exclude "Other[-]Crimes" Evidence*

¶ 13      In November 2013, defendant filed three pretrial motions. The first was a response to the State's first motion *in limine*. Defendant's motion sought "to exclude all evidence of other crimes and bad acts relating to the alleged rival groups [M.O.B.] and [B.O.M.]" That motion stated further that "the probative value of gang membership evidence *** is substantially outweighed by the risk of unfair prejudice."

¶ 14          4. *Defendant's Motion for Voir Dire Questioning About Gang Bias*

¶ 15      Defendant's second motion was titled "Defendant's Motion Requesting the Court to Ask Specific Questions to All Potential Jurors Regarding Gang Bias." Specifically, the motion requested that the court ask the following questions of each potential juror during *voir dire*:

> "(a) have you, any member of your family or a close friend of yours ever been involved in a gang; (b) have you ever know [*sic*] anyone who is in a gang; (c) do you think that someone who is in a gang is necessarily a criminal; (d) do you understand that it is not a crime just to join a gang; (e) do you understand that one member of a gang is not legally responsible for the actions of other gang members just because they are in the same gang; (f) would you find a member of a gang less believable if you learned that the witness belonged to a gang; and (g) would you be able to put aside any feelings you may have about gangs, and give the defendant a fair trial based on the evidence?"

In the concluding paragraph of the motion, defendant requested, in the alternative, that defense counsel, instead of the court, be allowed to ask the foregoing questions during *voir dire*.

¶ 16          5. *Defendant's Motion To Exclude Evidence of Jail Visits by Codefendants*

¶ 17      Defendant's third motion responded to the State's second motion *in limine* and argued that the trial court should prevent the State from introducing evidence that defendant was visited in jail by his three codefendants. Defendant argued that evidence of the visits was not relevant to establish accountability and that the evidence was substantially more prejudicial than probative because it risked "guilt by association."

¶ 18          6. *Hearing on Pretrial Motions*

¶ 19      At a hearing later in November 2013, the trial court addressed the parties' motions. The State asserted that it intended to dismiss the charge of possession of a firearm by a street gang

member. The State confirmed that it did "not intend to introduce any evidence in [its] case in chief of gangs, gang involvement, gang affiliation, or street gangs in general."

¶ 20    As to the State's first motion *in limine*—to introduce "other[-]crimes" evidence—defendant argued that he was not involved in the other incidents and that the State intended to introduce those incidents to "allude that [defendant] is some type of gang-related member." The trial court decided that the other-crimes evidence listed in the motion was admissible to show a continuing narrative and motive. The court noted that the other-crimes evidence was "relevant" and appropriately limited in scope.

¶ 21    The trial court then addressed the State's second motion *in limine*—to admit evidence that defendant was visited in jail by his three codefendants. Defendant argued that the State's motion framed this evidence as relevant on an accountability theory but that the State did not intend to pursue an accountability theory at trial. The State conceded that it was not pursuing an accountability theory but argued that the evidence was also relevant to show a common purpose. The court asked defendant, "What is the prejudicial effect of the fact that these folks visited?" Defendant reiterated that he was concerned about guilt by association. The court ruled the evidence admissible, as it was probative of the relationship between defendant and his codefendants and was not highly prejudicial.

¶ 22    The trial court then took up defendant's motion regarding *voir dire*. The court noted that "it's already been clarified that the State does not intend to present any gang references whatsoever during their case in chief." Defendant argued that his motion applied "whether we call them gangs or we call them groups, it doesn't matter to the jury" because "it's going to be portrayed that it's a gang, even if you don't call it a gang." Defendant requested to amend his motion to have the jurors questioned about their impartiality toward rap groups instead of gangs. The State argued that questioning the potential jurors about rap groups would be confusing and would create an inference that the rap groups were indeed gangs.

¶ 23    The trial court found that describing M.O.B. and B.O.M. as rap groups would not cause the jurors to conclude that those groups were gangs. The court found further that there was no "relevance whatsoever to questioning the jurors about whether or not they're biased against street gangs in a case where there is no intention to present evidence of street gangs." The court denied defendant's motion. The court ruled, however, that it would question prospective jurors about any knowledge they had of M.O.B. and B.O.M. because those groups had received some local media coverage. If prospective jurors stated they were familiar with the groups, the court stated it would respond by "appropriately following up on those to make sure there's no bias."

¶ 24                                    C. *Voir Dire*

¶ 25    Later in November 2013, the cause proceeded to a jury trial. Prior to trial, the State dismissed count IV—possession of a firearm by a street gang member.

¶ 26    During *voir dire*, the trial court questioned the prospective jurors, in relevant part, as follows:

> "There very well may be evidence presented during this particular trial that the defendant or perhaps other witnesses who may be involved in the trial may have been associated with one or two groups in the community which I think the evidence may show are involved in producing and recording what is commonly referred to as either rap or hip-hop-type music. The evidence will show that these two groups are often

referred to by their initials that make up their name. One of those groups is known as the initials B.O.M., the other is known by the initials M.O.B."

¶ 27 The trial court then asked whether any of the prospective jurors had heard of B.O.M. or M.O.B. One prospective juror responded that three or four years ago, he heard people talking about the groups at the local community center. The juror stated that he did not remember any details about the groups and did not form any opinions about them that would prevent him from being a fair and impartial juror.

¶ 28 The State later questioned a prospective juror who identified herself as a country singer about whether she had a bias toward rap groups. The prospective juror stated that she did not. No further questions about the jurors' impartiality toward rap groups or gangs were asked by the trial court or the parties.

¶ 29                                              D. Trial

¶ 30                                       1. *The State's Evidence*

¶ 31 Pursuant to the parties' stipulation, the trial court informed the jury that defendant had been convicted of a felony prior to November 5, 2012. The court instructed the jury that it should consider defendant's felony conviction only when determining defendant's guilt for unlawful possession of a weapon by a felon.

¶ 32 Bloomington police officer Eric Riegelein testified that at approximately 4:16 p.m. on November 5, 2012, he responded to a call of a shooting on Orchard Road. He arrived on the scene and observed Marcus Winlow lying on the ground. Michelle Brown was holding a bloody cloth against a wound on Winlow's body. Robert Jackson was nearby and had been shot in the left thigh. Nobody at the scene informed Riegelein what had happened.

¶ 33 Detective Clayton Arnold of the Bloomington police department testified that on November 5, 2012, at approximately 4:31 p.m., he arrived at the scene on Orchard Road. He was told that Winlow and Jackson had been shot. Kaythiese Fitch told Arnold that he had been punched in the mouth. In the south end of a nearby vacant lot, Arnold found three spent .45-caliber shell casings.

¶ 34 Detective Scott Mathewson of the Bloomington police department testified that on November 5, 2012, he visited Jackson in the hospital. The State introduced photographs of the bullet wound on Jackson's inner left thigh. The State also introduced a photograph of a bulge below the skin on Jackson's outer left thigh, where the bullet remained lodged. Hospital staff informed Mathewson that they would not remove the bullet because it was not life threatening.

¶ 35 Michelle Brown testified that on November 5, 2012, she lived in an apartment at 1213 Orchard Road. Her son, Winlow, lived at 1215 Orchard Road. Winlow was a member of B.O.M., a group that produced rap music. Brown testified further that on the afternoon of November 5, 2012, she found Winlow lying on the ground outside her home with a gunshot wound in his back. Brown testified that she did not know who had shot her son.

¶ 36 Brown testified further that she remembered telling a police officer who responded to the scene that she had seen her son get shot and knew who the shooter was. She told the officer that defendant, Williams, Kenneth King, Qunshawn Gardner, and Anton Smith were present during the shooting. Brown testified that the statements she made to the officer were not true. Brown testified that, in actuality, she did not see the shooting and was told what happened by a

woman who witnessed it. Brown testified that she did not remember telling the officer that (1) Williams shot Winlow, (2) defendant shot Jackson, or (3) she saw a black gun.

¶ 37    Brown testified further that after speaking with the officer at the scene, she went to the police station for an interview with another police officer. Brown testified that she remembered telling that officer that on November 5, 2012, she was walking behind Winlow and Fitch when the two men stopped to talk to Jackson. As the three men were talking, another group of men—including defendant, Williams, King, Gardner, Davis, and Smith—came around the corner. Brown testified that she did not remember telling the officer that she saw Williams shoot Winlow. Brown testified further that she did not remember telling the officer that she saw defendant shoot at Jackson and Fitch as they ran away. Brown testified that she had given prior testimony before a grand jury in this case but could not remember what she testified to.

¶ 38    The State later introduced a recorded interview of Brown conducted at the police station on the evening of November 5, 2012. Defendant objected, but the trial court admitted the evidence as a prior inconsistent statement. The interview was played for the jury.

¶ 39    During the interview, Brown stated that on November 5, 2012, she was walking on Orchard Road behind Winlow and Fitch, who both stopped to talk to Jackson. As the three were talking, a group of other men approached them. The other group included defendant, Williams, "S Dot," "Kenny," "Play," and approximately four other people. Fitch and "Play" began fighting. Williams pulled out a gun and shot Winlow one time. Williams then ran off. Fitch and Jackson ran toward a nearby gangway. Defendant pulled out a gun and fired approximately four times toward the gangway. Brown stated that defendant shot Jackson in the leg. Later in the interview, Brown stated that she did not actually see Jackson get shot. "S Dot" also had a gun and pointed it at Brown when she accidentally picked up "S Dot's" jacket. Brown stated further that Raymond Davis, who was also present, was carrying a gun and wearing dreadlocks.

¶ 40    Williams testified that he did not remember anything that occurred on November 5, 2012. He testified that he remembered giving a statement to police on November 6, 2012, but he did not remember what he said during that statement.

¶ 41    The State later introduced a recorded interview with Williams conducted at the police station on November 6, 2012. The trial court admitted the recording over defendant's objection, finding that it contained prior inconsistent statements. In the interview, Williams stated that King had been stabbed within the previous month. Williams stated further that the rivalry between M.O.B. and B.O.M. started over a microphone at a rap show. Williams's group, M.O.B., had a concert at which they let B.O.M. perform first. During B.O.M.'s performance, one of the microphones did not work. When the microphone later began working during M.O.B.'s performance, Winlow, a member of B.O.M., became angry and started a fight with M.O.B. members. That fight occurred "a long time ago, when the Elk's was open." When shown a picture of a B.O.M. member, "Rob," Williams stated that Rob owned a gun and had shot at Williams on a prior occasion.

¶ 42    Jackson testified that he was shot in the left thigh on November 5, 2012. As of the time of trial, the bullet remained in his thigh. Jackson testified that he was friends with Winlow and Fitch. Jackson testified further that he was not familiar with B.O.M. or M.O.B. In addition, he testified that neither he nor Winlow made rap music but that Fitch did.

¶ 43 Jackson testified further that he was walking by himself in the lot on Orchard Road when he was shot. He did not see who shot him. He went to the hospital, where doctors told him that the bullet could stay in his leg because it was not life threatening. Jackson stated that he still had a scar where the bullet entered and a lump where the bullet remained in his leg. Jackson said that his leg stiffens when the weather is cold or rainy but otherwise does not hurt. During the two weeks after he was shot, Jackson felt a "throbbing sensation" in the leg.

¶ 44 Bloomington police officer Michael Luedtke testified that on November 5, 2012, he responded to a call on Orchard Road. He observed Winlow lying in the road next to a parked car and Jackson sitting on the hood of that car. Winlow had a wound to his abdomen. Jackson had a bullet wound on his left thigh. Jackson told Luedtke that he did not know who had shot him.

¶ 45 Luedtke testified further that Brown approached him and told him she saw a group of people shoot at Winlow and Jackson. Luedtke testified further that Brown said she saw defendant, Williams, "Kenny," "S Dot," and "Play" "run up on" Winlow and Jackson. Brown told Luedtke that she saw defendant shoot at Jackson five times.

¶ 46 Davis testified that on the afternoon of November 5, 2012, he was at King's apartment in the 1200 block of Orchard Road. Defendant was also there. Davis, King, and defendant made hip-hop music together in a group called "M.O.B., Members of Business," and that they were making hip-hop music together that day at King's apartment.

¶ 47 While Davis was at King's apartment, he got in a fight with Winlow. After the fight ended, Davis, King, and defendant went to defendant's apartment. "S Dot" and "Play" joined them there. Davis testified further that after staying at defendant's apartment for approximately 15 minutes, the group decided to record music at a local studio.

¶ 48 Davis, defendant, King, and "S Dot" got in a van and drove back to King's apartment to retrieve King's phone, which had music on it that the group needed for their recording session. As they walked from the van to King's apartment, a group of people ran up and attacked them. Davis heard gunshots and ran back to the van, along with King and "S Dot." Defendant did not return to the van.

¶ 49 Davis testified further that on November 5, 2012, he had cheek-length dreadlocks. Davis had heard of a group called B.O.M. but did not know whether Winlow and Fitch were part of that group.

¶ 50 Detective Jared Roth with the Bloomington police department testified that a rivalry existed between the M.O.B. and B.O.M. rap groups. He stated further that M.O.B. stood for "Money Over Bitches," and B.O.M. stood for "Blackout Mafia." While investigating the shooting, Roth received "extremely little cooperation" from the eyewitnesses. On cross-examination, Roth testified that on December 12, 2012, he executed a search warrant for 822 East Washington Street, where he found a .45-caliber firearm in the possession of a man named Style Gray. The shell casings found in that firearm and the three shell casings found at the scene of the alleged offenses were sent to the Bureau of Alcohol, Tobacco, Firearms, and Explosives for testing. That testing revealed that the shell casings found at the scene did not match those in Gray's firearm.

¶ 51 The trial court read to the jury an evidence stipulation agreed to by the parties. The stipulation stated that while defendant was in pretrial custody, he was visited by King,

Gardner, and Smith.

¶ 52                                   2. *Defendant's Evidence*

¶ 53      Brandi Guzouskis testified that on November 5, 2012, she lived at 1214 Orchard Road. Guzouskis was home that day when, at approximately 4:15 p.m., she heard "about five" gunshots. The balcony to Guzouskis's apartment overlooked the vacant lot on Orchard Road. After she heard gunshots, Guzouskis looked out her balcony door and saw several men walking east. She called 911 and told them that a black male with a white tank top, dark jeans, and dreadlocks had a gun. She then saw the man shoot the gun two times while aiming toward the north. She saw two men on the ground. Defendant then introduced the audio recording of Guzouskis's 911 call.

¶ 54      Anthony Gibson testified that on November 5, 2012, he was working at Lube Pros just off Orchard Road. At approximately 4:16 p.m., he heard between six and eight gunshots. Gibson thought he had heard kids playing with fireworks. The shots came in two waves: "a few gunshots, then there was a pause, and there was a pause and then there was a few more." Gibson did not see who fired the gunshots but saw people running.

¶ 55      Brittany Van Buren testified that she was defendant's girlfriend. She stated that on November 5, 2012, defendant had short hair and did not have dreadlocks. She testified further that defendant did not own a gun.

¶ 56      The jury found defendant guilty on all four counts. As to the charge of attempt (murder), the jury also found that defendant personally discharged a firearm that proximately caused great bodily harm or permanent disfigurement to another.

¶ 57                                   E. Posttrial Motions

¶ 58      In December 2013 and January 2014, defendant filed two motions for judgment notwithstanding the verdict or for a new trial. In the first motion, defendant argued, in relevant part, that he was denied a fair trial "when the court erred in denying the defendant's motion requesting the court, or through defense counsel, to ask seven specific question[s] to all potential jurors regarding gang bias."

¶ 59      At a January 2014 hearing, the trial court addressed defendant's motions. As to defendant's argument that the court should have questioned the potential jurors about gang bias, the court said, "in a case where there was no gang evidence, there is no relevance to *voir diring* [*sic*] the jury on that issue, and that's why the court said, no, you can't go there." The court explained that it was not clear that M.O.B. and B.O.M. were gangs, where "there was no evidence presented that these were gangs," and "the individuals themselves say they're not gangs."

¶ 60      At that same hearing, the trial court conducted a sentencing hearing. The court sentenced defendant to 47 years in prison, after applying the mandatory 25-year enhancement because defendant personally discharged a firearm that proximately caused great bodily harm or permanent disfigurement. The court also sentenced defendant to a concurrent sentence of eight years in prison for possession of a weapon by a felon.

¶ 61      This appeal followed.

¶ 62                                II. ANALYSIS

¶ 63        Defendant raises the following arguments: (1) the trial court abused its discretion by
denying defendant's motion that the court question potential jurors about their gang bias, (2)
the court abused its discretion by admitting specific acts of violence that occurred between the
two groups, (3) the court abused its discretion by admitting evidence that defendant was visited
in jail by his codefendants, (4) counsel was ineffective for failing to move to sever the charge
of unlawful possession of a weapon by a felon, and (5) the evidence was insufficient to prove
that defendant personally discharged a firearm that caused great bodily harm or permanent
disfigurement. We address defendant's arguments in turn.

¶ 64                       A. *Voir Dire* Regarding Gang Bias

¶ 65        Defendant argues that the trial court abused its discretion by denying his motion requesting
that the court question potential jurors about their gang bias. We disagree.

¶ 66                    1. *Applicable Law and Standard of Review*

¶ 67        The United States and Illinois Constitutions guarantee criminal defendants the right to a
trial by a fair and impartial jury. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. *Voir
dire* questioning is essential to ensuring that the jury is impartial. A juror may be partial by
harboring "strong prejudice against street gangs." *People v. Strain*, 194 Ill. 2d 467, 477, 742
N.E.2d 315, 320 (2000). As a result, "when testimony regarding gang membership and
gang-related activity is to be an integral part of the defendant's trial, the defendant must be
afforded an opportunity to question the prospective jurors, either directly or through questions
submitted to the trial court, concerning gang bias." *Id.*, 742 N.E.2d at 321.

¶ 68        A trial court's decisions regarding *voir dire* issues are reviewed for an abuse of discretion.
*Id.* at 476, 742 N.E.2d at 320. The court must exercise its discretion "in a manner consistent
with the purpose of *voir dire*." *Id.* The purpose of *voir dire* is " 'to assure the selection of an
impartial panel of jurors who are free from bias or prejudice.' " *People v. Howard*, 147 Ill. 2d
103, 133, 588 N.E.2d 1044, 1055 (1991) (quoting *Kingston v. Turner*, 115 Ill. 2d 445, 464, 505
N.E.2d 320, 328 (1987)). "[L]imitation of *voir dire* questioning may constitute reversible error
where such limitation denies a party a fair opportunity to probe an important area of potential
bias or prejudice among prospective jurors." *People v. Pineda*, 349 Ill. App. 3d 815, 818, 812
N.E.2d 627, 631 (2004).

¶ 69              2. *The Trial Court's Decision To Deny Defendant's Motion*

¶ 70        Defendant argues that the trial court, by denying his motion, denied him a fair opportunity
to probe prospective jurors' potential bias toward gangs and rap groups. We disagree.

¶ 71        The trial court's ruling was that the court would not question the venire about gang bias;
the court did not rule that defendant, through defense counsel, could not question the venire on
that issue. Defendant's motion was titled, "Defendant's Motion Requesting *the Court* to Ask
Specific Questions to All Potential Jurors Regarding Gang Bias." (Emphasis added.) In the
body of that motion, defendant requested the court to ask prospective jurors the seven specific
questions. It was only in the concluding paragraph of defendant's motion that he requested, "in
the alternative[,] to allow the defendant, through his attorney, to ask" about gang bias.
Likewise, at the hearing on defendant's motion, the court introduced the motion as

"defendant's motion requesting *the Court* to ask specific questions to all potential jurors regarding gang bias." (Emphasis added.) When the court denied defendant's motion at the hearing, the court did not address or limit defense counsel's ability to question the venire about potential gang or rap group bias. Later, during *voir dire*, defense counsel questioned prospective jurors about whether they harbored biases relating to race, political ideology, religion, or firearms. Defense counsel did not attempt to ask whether the venire held any bias toward gangs or rap groups.

¶ 72    Defendant had an obligation to clarify whether the trial court's ruling prohibited him, through defense counsel, from questioning prospective jurors on the issue of gang or rap group bias. "[I]t is the responsibility of the party filing a motion to request the trial judge to rule on it, and when no ruling has been made on a motion, the motion is presumed to have been abandoned absent circumstances indicating otherwise." *Rodriguez v. Illinois Prisoner Review Board*, 376 Ill. App. 3d 429, 433, 876 N.E.2d 659, 663 (2007). "A litigant's failure to obtain a ruling on a motion does not translate into a denial of the motion by the court." *Id.* at 432, 876 N.E.2d at 663. Here, the court never addressed whether defense counsel could question prospective jurors about their bias toward gangs. By failing to request a ruling on that issue, defendant abandoned it.

¶ 73    We note that the trial court did not give defendant's motion short shrift. To the contrary, the court considered defendant's argument but found no "relevance whatsoever to questioning the jurors about whether or not they're biased against street gangs in a case where there is no intention to present evidence of street gangs."  In considering this issue, the court did acknowledge the prospective jurors might harbor some bias toward these *specific* groups—B.O.M. and M.O.B.—because they had appeared in the local news. As a result, the court agreed to question venire members about their knowledge of B.O.M. and M.O.B. and to ask appropriate follow-up questions to ensure that no jurors held a bias toward the groups. The court did just that when faced with the one prospective juror who had heard of B.O.M. and M.O.B. This was not a situation in which the court rejected out of hand a colorable request by defendant.

¶ 74          B. Defendant's Claim That the Court Abused Its Discretion by Admitting
             Specific Acts of Violence That Occurred Between the Two Groups

¶ 75    Defendant argues that the trial court abused its discretion by admitting testimony regarding specific acts of violence that occurred between the two groups. Specifically, defendant argues that the court should not have admitted Williams's interview because, in it, Williams states that King had been stabbed and that "Rob," a B.O.M. member, had previously shot at Williams.

¶ 76    We agree with defendant that "all of the parties [at trial] incorrectly treated this evidence as the traditional 'other[-]crimes evidence.' " Other-crimes evidence shows that "a crime took place and that *the defendant* committed it or participated in its commission." (Emphasis added.) *People v. Pikes*, 2013 IL 115171, ¶ 15, 998 N.E.2d 1247. Such evidence is inadmissible to show a defendant's propensity to commit crime. *Id.* ¶ 16; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). The concern is that other-crimes evidence is too relevant and might cause the jury to convict because it believes the defendant is a bad person. *Pikes*, 2013 IL 115171, ¶ 16, 998 N.E.2d 1247. However, "the concerns underlying the admission of other-crimes evidence are not present when the uncharged crime or bad act was not committed by the defendant." *Id.* As a result, when the State attempts to admit evidence of another crime that was

*not* committed by the defendant, that evidence is analyzed under "ordinary principles of relevance." *Id.* ¶ 20.

¶ 77   Those principles tell us that evidence is generally admissible if it is relevant. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011). The admissibility of evidence rests within the sound discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion. *Pikes*, 2013 IL 115171, ¶ 12, 998 N.E.2d 1247.

¶ 78   One way in which evidence can be relevant is to complete an ongoing narrative of events that culminated with the charged offenses. *Id.* ¶ 24. For instance, in *Pikes*, the State alleged that the defendant was a Four Corner Hustler gang member who committed a murder resulting from a conflict with rival Gangster Disciple gang members. The State introduced evidence that, the day before the alleged murder, a Gangster Disciple member, Robinson, drove a scooter through Four Corner Hustler territory while being followed by a car containing other Gangster Disciples. The defendant's codefendant then allegedly shot at Robinson before being struck by the car. The State alleged that the defendant and his codefendant committed murder to get revenge on the Gangster Disciples. *Id.* ¶ 3.

¶ 79   The *Pikes* court clarified that the evidence that the codefendant shot at Robinson was relevant to complete the narrative underlying the charged murder. As the court pointed out: "This was not a random incident in which a bystander was struck by a car. *** The events in this case that culminated in the [victim's] shooting were not only the car striking [the codefendant], but also [the codefendant's] shooting at Robinson. These two events were linked and it would be illogical for the trial court to uncouple them and give the jury only half the story." *Id.* ¶ 24.

¶ 80   We conclude that the Williams interview was relevant to establish a continuing narrative, and the trial court did not abuse its discretion by introducing that evidence. Williams's interview explained the relationship between B.O.M. and M.O.B. that led to the alleged events of November 5, 2012. Williams's interview was the only evidence that established that B.O.M. and M.O.B. had a rivalry because of a dispute over microphone time at a rap show. Williams also testified about the altercation between Fitch and King that occurred earlier on November 5, 2012. That evidence helped explain why a fight would break out later that day on Orchard Street. Without Williams's interview, the jury would have been presented with "only half the story." *Id.*

¶ 81   In so concluding, we acknowledge that evidence demonstrating a continuing narrative has typically been admitted in other-crimes cases. See, for instance, *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 58, 2 N.E.3d 642, where this court held that "[o]ther-crimes evidence is admissible if it is part of a continuing narrative of the event giving rise to the offense, intertwined with the charged offense, or explains an aspect of the charge which would otherwise be implausible or inexplicable." In other words, without the continuing narrative evidence, "the fact-finding process would be shortchanged because the jury would be limited to considering 'a sterile environment' " bereft of the event's history. *People v. Carter*, 362 Ill. App. 3d 1180, 1190, 841 N.E.2d 1052, 1060 (2005). This court also applied the continuing narrative exception in *People v. Johnson*, 368 Ill. App. 3d 1146, 1155-56, 859 N.E.2d 290, 299

(2006), and *People v. Slater*, 393 Ill. App. 3d 977, 992-93, 924 N.E.2d 1039, 1052 (2009), where we concluded that without the evidence admissible under that exception, the behavior of the defendants in these cases would have been inexplicable.

¶ 82　　Although *Patterson*, *Carter*, *Johnson*, and *Slater* were all cases dealing with other-crimes evidence because the defendants in those cases were each alleged to have engaged in other criminal conduct, the reasoning underlying the continuing narrative exception to the prohibition against other-crimes evidence is fully applicable in a case like this, as in *Pikes*, where the issue before the court is one of relevancy. Thus, as earlier stated, we conclude that the Williams interview was relevant because it established a continuing narrative that explained the relationship between B.O.M. and M.O.B. that led to the events on the day in question.

¶ 83　　The prejudicial effect of Williams's interview did not substantially outweigh its probative value. Although testimony about bad acts by other M.O.B. members might reflect poorly on defendant, the trial court was careful to limit the evidence to events that were recent and relevant to the charged offenses. In light of the highly probative nature of the admitted other-crimes evidence, the court did not abuse its discretion by admitting it.

¶ 84　　　　　　　　　　　　C. Jail Visits by Codefendants

¶ 85　　Defendant argues that the court abused its discretion by admitting evidence that defendant was visited in jail by his codefendants.

¶ 86　　The State argues that defendant has waived review of this issue by stipulating to the evidence. We agree. "Parties who agree to the admission of evidence through a stipulation are estopped from later complaining about that evidence being stipulated into the record." *People v. Calvert*, 326 Ill. App. 3d 414, 419, 760 N.E.2d 1024, 1028 (2001). Here, the parties entered a written stipulation that defendant's codefendants had visited him in jail. Defendant is therefore now estopped from complaining about the admission of that evidence. Defendant's prior objection to the evidence is irrelevant. Defendant waived that objection when he stipulated to the admission of the evidence without any statement that he intended to preserve his objection to the evidence.

¶ 87　　In any event, the trial court did not abuse its discretion by admitting this evidence. Evidence that defendant was visited in jail by his close friends—who happened to also be his codefendants—is not terribly surprising or prejudicial. This was not a case in which defendant's theory at trial relied on minimizing his relationship to the other members of M.O.B. Although we fail to see how this evidence was particularly probative, it was still admissible because the *de minimis* prejudicial effect of the evidence did not substantially outweigh its probative value.

¶ 88　　　　　　　　　　　　D. Ineffective Assistance

¶ 89　　Defendant argues that trial counsel was ineffective for failing to move to sever the charge of unlawful possession of a weapon by a felon. We decline to reach the merits of this claim because it is better pursued under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2014)).

¶ 90　　Claims of ineffective assistance of counsel are judged pursuant to the standard established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). The

*Strickland* standard requires a defendant to demonstrate that (1) defense counsel's performance was so deficient that "counsel was not functioning as the 'counsel' guaranteed the defendant by the [s]ixth [a]mendment" and (2) but for defense counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687. To prove that counsel's performance was deficient, a defendant must overcome the strong presumption that the challenged action or inaction was the product of sound trial strategy. *Id.* at 689.

¶ 91    In *People v. Kunze*, 193 Ill. App. 3d 708, 726, 550 N.E.2d 284, 296 (1990), this court held that claims of ineffective assistance of counsel are often better made in proceedings on a petition for postconviction relief, where a complete record can be made. Here, as in *Kunze*, the record before us contains nothing to review counsel's trial strategy. Without a record, we are unwilling to deem counsel ineffective for failing to move to sever the charge of unlawful possession of a weapon by a felon. Counsel's decision not to sever may have resulted from a reasonable "all-or-nothing" strategy that would prevent the State from getting "two bites at the apple." See *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10, 972 N.E.2d 340 (counsel's decision not to sever the charge of unlawful possession of a firearm by a felon was potentially trial strategy). Because the answer to whether counsel's decision was one of trial strategy is currently *de hors* the record, we decline to consider it and instead will await defendant's pursuit of such a claim under the Act (725 ILCS 5/122-1 to 122-7 (West 2014)).

¶ 92                              E. Sufficiency of the Evidence

¶ 93    Defendant argues that the evidence was insufficient to prove that he personally discharged a firearm that caused great bodily harm or permanent disfigurement—a fact that served as a sentencing enhancement. As a result, defendant requests that we reduce his sentence by five years. We disagree.

¶ 94    "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48, 1 N.E.3d 888. When considering a challenge to the sufficiency of the evidence, we will not retry the defendant. *People v. Davis*, 2014 IL App (4th) 121040, ¶ 27, 22 N.E.3d 1167. We will not reverse a conviction unless it is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *Id.*

¶ 95    Defendant argues that the State's evidence was lacking in two ways, either of which would result in a reduction of his sentence: (1) the evidence was insufficient to show that defendant fired the bullet that entered Jackson's leg and (2) the evidence was insufficient to show that Jackson's bullet wound constituted great bodily harm or permanent disfigurement.

¶ 96                          1. *Evidence That Defendant Fired the Bullet*
                                  *That Entered Jackson's Leg*

¶ 97    Defendant argues that there was insufficient evidence to prove that he, and not another shooter, fired the bullet that hit Jackson's leg. We disagree.

¶ 98    In Brown's recorded interview, she stated that she saw defendant shoot at Jackson approximately four times. Brown stated that although she did not see Jackson get shot, defendant was the only person who could have shot him. Luedtke also testified that Brown told

him she saw defendant shoot at Jackson. The fact that defendant was not the only person who discharged a firearm at the scene does not mean that the evidence was insufficient to show that defendant, in particular, fired the bullet that hit Jackson. Brown's testimony specifically connected defendant to the shot that hit Jackson. Considering the evidence in the light most favorable to the State, we must assume that the jurors considered Brown's recorded statement credible. Brown's statement alone constituted sufficient evidence to prove that defendant fired the bullet that hit Jackson.

¶ 99     2. *Evidence That Jackson's Bullet Wound Constituted Great Bodily*
*Harm or Permanent Disfigurement*

¶ 100     Defendant also argues that even if he fired the bullet that hit Jackson, Jackson's bullet wound did not constitute great bodily harm or permanent disfigurement. We disagree.

¶ 101     The term *great bodily harm* is not susceptible to precise legal definition. *People v. Mimes*, 2014 IL App (1st) 082747-B, ¶ 29, 13 N.E.3d 222. However, great bodily harm must require harm more serious than the bodily harm needed to satisfy an ordinary battery. *Id.* Ordinary battery requires a showing of "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." *People v. Mays*, 91 Ill. 2d 251, 256, 437 N.E.2d 633, 635-36 (1982).

¶ 102     No meaningful difference exists between the terms "great bodily harm" and "severe bodily injury." *People v. Witherspoon*, 379 Ill. App. 3d 298, 308, 883 N.E.2d 725, 734 (2008). Although some cases have held that a bullet wound did not constitute severe bodily injury, those cases did not involve situations where the bullet entered and lodged within the victim. See *People v. Ruiz*, 312 Ill. App. 3d 49, 726 N.E.2d 704 (2000) (no severe bodily injury where victim did not immediately realize he had been shot and no evidence was presented that the bullet entered his body); *People v. Durham*, 312 Ill. App. 3d 413, 421, 727 N.E.2d 623, 628 (2000) (no severe bodily injury where the bullet wound was described as " 'a small nick or cut' "); see also *Mimes*, 2014 IL App (1st) 082747-B, ¶ 32, 13 N.E.3d 222 (citing *Ruiz* and *Durham* for the proposition that "a gunshot wound does not necessarily satisfy the great bodily harm requirement").

¶ 103     In this case, Jackson testified that the bullet entered his inner thigh and remained lodged in his leg. This was not a situation in which the bullet merely grazed him and left a minor cut or scrape. We have found no case law holding that a gunshot wound in which a bullet enters the victim's body does not constitute great bodily harm. The fact that doctors in this case determined that the bullet could safely remain in Jackson's body does not preclude a finding of great bodily harm. A rational jury could find that Jackson suffered great bodily harm when he was shot by a bullet that remained lodged in his leg.

¶ 104     III. CONCLUSION

¶ 105     For the foregoing reasons, we affirm the judgment of the trial court. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

¶ 106     Affirmed.