NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190099-U

NO. 4-19-0099

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 11, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Logan County |
| GERALD L. THOMAS JR., | ) | No. 17CF202 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | William G. Workman, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, concluding the trial court did not err by admitting evidence of defendant's gang affiliation.

¶ 2     Following a December 2018 bench trial, defendant, Gerald L. Thomas Jr., was found guilty of two counts of attempt (first degree murder) (720 ILCS 5/8-4(a), (c)(1)(D), 9-1(a)(1) (West 2016)), one count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2016)), and one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2016)). The trial court sentenced defendant to 55 years' imprisonment for the first count of attempt (first degree murder) (30 years for the offense plus 25 years for the mandatory firearm enhancement), 21 years' imprisonment for the second count of attempt (first degree murder) (6 years for the offense plus 15 years for the mandatory firearm enhancement), and 10 years'

imprisonment for unlawful possession of a weapon by a felon. The court merged the aggravated battery conviction into the attempt (first degree murder) conviction (count I). The sentences were to be served consecutively for an aggregate term of 86 years' imprisonment.

¶ 3        Defendant appeals, arguing the trial court erred by improperly allowing the State to present irrelevant and prejudicial evidence of defendant's gang affiliation. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5                                      A. Charges

¶ 6        In December 2017, a grand jury indicted defendant with attempt (first degree murder) (counts I and II) (720 ILCS 5/8-4(a), (c)(1)(D), 9-1(a)(1) (West 2016)), aggravated battery (count III) (720 ILCS 5/12-3.05(e)(1) (West 2016)), aggravated discharge of a firearm (count IV) (720 ILCS 5/24-1.2(a)(2) (West 2016)), and unlawful possession of a weapon by a felon (count V) (720 ILCS 5/24-1.1(a) (West 2016)). The charges alleged defendant used a firearm to shoot Manuel Pratt and Alonzo Rose on October 1, 2017.

¶ 7                                    B. Bench Trial

¶ 8        Defendant's bench trial spanned four days in December 2018 with a total of 13 witnesses called to testify. Included among the various exhibits were several videos and photographs published on Snapchat, a multimedia messaging application, and a video recording captured by Walmart surveillance cameras. During the course of the trial, the court took up the State's proffered intention to use the images as other crimes evidence to show gang affiliation, motive, common purpose, or design. Defense counsel objected on the grounds the proffered evidence was more prejudicial than probative and argued much of the evidence was not directly connected to this defendant or the charged offenses. We will set forth only the evidence necessary to the disposition of this appeal.

¶ 9                    1. *The State's Evidence*

¶ 10            Sergeant Todd Baur of the Logan County Sheriff's Office testified he responded to a "shots fired call" at approximately 2 p.m. on October 1, 2017, at 713 Walnut Street in Lincoln, Illinois. When Baur arrived at the scene, he "observed a male laying on the ground near a car and another male *** tending to him because he had some gunshot wounds." While waiting on crime scene investigators to arrive, Baur maintained security of the scene and "found four shell casings near a tree and a fence."

¶ 11            Nolan Kitterman testified he heard approximately "eight to ten shots" in the afternoon of October 1, 2017, while washing his hands in the bathroom of his home on 2nd Street in Lincoln, Illinois. Kitterman testified that "the first two shots were definitely clear," and "there was more than one shot at the same time so up to two weapons." As soon as he heard the second shot, Kitterman "ran to the front of the house *** and looked out the window, and [he] saw people scattering across the front." Kitterman "saw a person laying on the ground *** and ran across the street." By the time Kitterman arrived at the scene, the man lying on the ground "had stood up and was laying against the car."

¶ 12            Manuel Pratt, an inmate in the Illinois Department of Corrections (DOC) and testifying pursuant to a plea agreement, testified he was shot twice by defendant in his left arm and once in the chest by "Baby Jay," later identified as Jeremiah Friend, on October 1, 2017. As of the time of trial, the bullets remained in Pratt's back, shoulder, and wrist. Pratt acknowledged he had a criminal record and, in exchange for his testimony in this case, the State offered him a seven-year sentence in an unrelated case.

¶ 13            Pratt testified he and Alonzo Rose were cousins, and they shared an apartment in the "two-flat apartment building" at 713 Walnut Street. On September 15, 2017, several weeks

before the shooting, Pratt testified there "was a fight" involving Rose and defendant at Walmart. Pratt stated he had reviewed People's Exhibit 84 prior to his testimony. He testified that People's Exhibit 84, which consisted of a video recording captured by Walmart surveillance cameras, fairly and accurately depicted the images of what happened in Walmart that day. The State then played the video for the trial court and asked Pratt to describe what the video depicted.

¶ 14        The recording is in color, has no sound, and is time-stamped 2:59:39 p.m. The picture quality is fair. At 3 p.m., the camera points at the customer service department facing the checkout aisles. Pratt identified himself standing at a cash register purchasing bleach and detergent. He then identified Rose as the individual standing next to him wearing "a jersey." While walking toward the exit, Rose turns around and briefly walks out of the camera's field of view but reappears when the recording cuts to the camera facing out from behind the customer service desk. When the video showed Pratt and Rose speaking to defendant in the customer service department, Pratt testified defendant's demeanor "was cool" until they began talking about a separate incident involving one of Pratt's cousins, Cortez Gardner. Pratt testified he requested a "one-on-one" fight with "Big Fleet," later identified as Shondale Henson, "[b]ecause he broke Cortez' jaw." Defendant threw the first punch, and the video showed Pratt attempting to restrain Rose outside of the customer service department. As Pratt and Rose began walking toward the store's exit again, Pratt identified defendant "yelling out." Pratt testified Rose and defendant were "fighting at the end," at which point the store manager asked them to leave.

¶ 15        On the day of the shooting, Pratt and Rose "went up to the Walmart and got some sandwiches and water and stuff." Pratt testified he stopped his vehicle at "3rd and College" on their return trip home because Rose had "seen somebody he knew he wanted to speak to." Shortly after, Pratt testified, a blue Ford truck "pulled up at the stop sign, stopped, and *** a

- 4 -

couple of seconds later [he] heard a commotion." Pratt observed defendant "standing by his car door yelling out at Alonzo," and, believing a fight was about to occur, Pratt exited his vehicle and stepped between Rose and defendant. According to Pratt, defendant then "hopped in his car," and steered towards him before driving away.

¶ 16 Within ten minutes of returning home, Pratt observed defendant's vehicle again, "[c]oming around the corner on Maple by the [Logan County Health Department]." Pratt also observed a white Cadillac truck driving down 3rd Street towards Maple Street and watched the Cadillac "pull up right behind the blue Ford in the dock of the [health department]." Pratt watched defendant's vehicle, followed by the white Cadillac, leave the parking lot and eventually stop in front of his apartment. Pratt testified defendant exited the front driver-side door of the Ford and walked around to the back of the Cadillac. Friend exited the back passenger-side door of the Cadillac. "Once Baby Jay got out, Baby Jay had a gun in his hand." Pratt "heard Alonzo's feet took [*sic*] off, rocks kicking. That's when [defendant] came around, [and] shot toward the back of the house at Alonzo." Pratt saw Friend and defendant fire between two to four shots each. After collapsing from his wounds, Pratt "just laid on the ground" as defendant and Friend returned to their vehicles and fled the scene.

¶ 17 On cross-examination, Pratt testified a neighbor attempted to address his wounds before being treated by emergency personnel. Pratt further testified he did not disclose defendant as one of his shooters until entering into his plea agreement with the State on October 26, 2017.

¶ 18 Shondale Henson testified he had a criminal record and acknowledged he initially gave false statements to the police because he had "a lot of loyalty for [defendant]." In exchange for his testimony in this case, the State offered Henson a sentence of "eight years at 85 percent" in his pending aggravated battery case. In October 2016, after losing his job in Chicago, Illinois,

Henson moved in with defendant because he "needed a place to stay." Henson came up with the moniker, "The Money Team [(TMT)]," and testified its members included himself, defendant, and Friend. Over defense counsel's objection, Henson testified defendant sold cocaine and explained the motivation behind TMT was acquiring money in "[a]ny way possible."

¶ 19 On September 30, 2017, Henson testified he went to "a video shoot" to make a rap music video in Bloomington, Illinois. Defendant, Friend, and Brandon Wells were present as well. The State presented People's Exhibit 101, which contained Snapchat Nos. 1-10. Henson identified Snapchat No. 6 as a photograph depicting himself, "Lamar," and defendant "[t]hrowing down a gang sign." Snapchat No. 7 was another photograph of Henson, Lamar, and defendant, who could be seen holding money and wearing shorts inscribed with the acronym "TMT."

¶ 20 On the day of the shooting, Henson testified he received a call from defendant to meet "by CEFCU bank." Defendant told Henson "they was [*sic*] trying to jump on [him] again," but gave no specifics. Henson and Casey Cottrill met with defendant, Friend, and Wells near the bank. Henson and Cottrill followed defendant's vehicle to Pratt's apartment. Henson testified he and Cottrill did not have any weapons. Upon their arrival, Henson heard gunshots and observed defendant and Friend holding guns. Defendant held a revolver. Following the shooting, Henson and Cottrill returned to Cottrill's home.

¶ 21 Lincoln police officer Matthew Comstock testified he was assigned as the lead detective following the shooting and, as part of his investigation, obtained search warrants for the Snapchat accounts belonging to defendant, Henson, Cottrill, and Friend. Comstock identified Snapchat Nos. 1-10 as being associated with these accounts. Snapchat Nos. 1-5 were taken from Friend's account; Snapchat No. 6 was taken from Henson's account; and Snapchat Nos. 7-10

were taken from defendant's account. Comstock further testified he received training in narcotics and gang intelligence. In his experience, gangs oftentimes used videos on social media—such as rap videos—to incite violence from other gangs.

¶ 22                                    2. *Defendant's Evidence*

¶ 23        Defense counsel presented the testimony of Alonzo Rose, who was currently serving a five-year sentence in an unrelated case. Rose acknowledged an ongoing dispute existed between himself and defendant since their altercation at Walmart in September 2017. On the day of the shooting, Rose testified he saw defendant drive past "[a] few blocks away" from Pratt's apartment and said he (Rose) "threw [his] hands up at him." Rose admitted his hand gestures were meant to antagonize defendant. Rose testified he and defendant "had a few words, and [defendant] kept going." Approximately 15 minutes after returning home, Rose observed two vehicles stop in front of the apartment "a few hundred feet away" from where he was standing. Rose recognized one of the vehicles as belonging to defendant. Rose testified two people got out and began shooting immediately. One of the individuals held a revolver. According to Rose, neither shooter was defendant and after the shooting started, Rose "turned around and ran."

¶ 24        Defendant testified on his own behalf and acknowledged his criminal history, which included prior convictions for aggravated unlawful use of a weapon, criminal damage to property, and unlawful delivery of a controlled substance. According to defendant, the altercation with Rose at Walmart concerned a separate incident where Henson broke Gardner's jaw because "[t]hey were messing with the same woman." Defendant told Rose he "didn't have anything to do with it" and testified things were "cordial" until Rose and Pratt "got aggressive."

¶ 25        On September 30, 2017, Henson, Friend, and Wells invited defendant to make a rap music video in Bloomington, Illinois. Defendant testified he was asked to bring some of his

own money for use as a prop in the video because "they knew [he] had more money than them." Defense counsel then showed defendant People's Exhibit 101. Defendant identified Snapchat No. 2 as a photograph depicting defendant's money and Friend's hand holding a gun. Snapchat No. 4 was a photograph of both Cottrill and Friend holding guns. Defendant identified Snapchat No. 5 as a photograph depicting Friend holding two guns. Snapchat No. 6 was a photograph of Henson and defendant "dropping a gang sign down" alongside "Alonzo and Manny's cousin." Defendant explained he was "dropping it" to "playfully" antagonize Curtis Kelley, a Gangster Disciple, who defendant testified, took the photograph. Defendant identified Snapchat No. 7 as a photograph of himself and Friend posing with "one of the rappers from the video."

¶ 26    Approximately 30 minutes before the shooting on October 1, 2017, defendant testified he "was coming from Third Street" and observed Rose, "standing on the side of the road *** trying to get [his] attention." Defendant "thought everything was cool" and pulled over. Defendant testified he "couldn't hear exactly what Alonzo was saying" and decided to leave after he observed Pratt walking towards his vehicle quickly. Defendant then drove to "Morningside Trailer Park" and picked up Wells and Friend, who defendant testified was "known for having guns." While at the trailer park, defendant called Kelley, who assured defendant he "would not have to worry about Mr. Pratt anymore, and [he] wouldn't have to ride around looking over [his] shoulder." Defendant "drove to First Street" and called Henson. Henson and Cottrill met defendant "a block away" in Cottrill's white Cadillac and followed defendant to Pratt's apartment. Upon their arrival, defendant testified Friend exited the vehicle and began shooting. Defendant "immediately ducked and hid behind the car." After the initial shots, defendant believed Pratt and Rose "were shooting back." Friend then "pointed the gun at [defendant] and said, Get the f*** in the car," before defendant drove back to the trailer park.

¶ 27                                3. *The Court's Ruling*

¶ 28        Following the parties' arguments, the trial court addressed the issues pertaining to the evidence of gang-related activity and prior criminal conduct. The court first examined the factors to be considered under Illinois Rules of Evidence 403 and 404 (eff. Jan. 1, 2011); "is this evidence probative and relevant" and, if so, "is it outweighed by the unfair prejudice that would be associated with allowing this information in?" It then found "that membership in the group going by the name TMT or The Money [Team], helped to explain the motive or the motivation behind the attack that took place on October 1st." The court explained there were "frictions *** between TMT and Mr. Pratt and Mr. Rose," which took place shortly before the shooting and concerned what originally was a fight between Henson and Gardner. "This friction led to further events, specifically the incident that happened at Walmart," where "all of a sudden, a fight breaks out between these two groups."

¶ 29        The trial court found Pratt's testimony to be credible, noting Pratt not only identified everyone's position at the time of the shooting, but also his shooters, and could "specifically identify where he was shot by both of those individuals." The court stated it believed Pratt's late disclosure identifying his shooters was due to "this code of silence that often goes with this type of activity."

¶ 30        The trial court also found Henson to be credible, although reluctant. The court noted Henson "put the gun in the Defendant's hand," and "didn't want to testify against an individual that was a member of his organization, his gang, the TMT," and who the court believed Henson looked to "as a leader."

¶ 31        The trial court found defendant's version of the events to be incredible, stating, "A reasonable explanation is that defendant's been having problems with Mr. Pratt and Mr.

Rose. After the second altercation, he wants to settle this dispute once and for all. *** He got his group, TMT, together, and then went over and took care of business."

¶ 32	Ultimately, the trial court found defendant guilty of both counts of attempt (first degree murder), aggravated battery, and aggravated discharge of a firearm.

¶ 33	C. Posttrial Motions and Sentencing

¶ 34	In January 2019, defendant filed a motion for new trial arguing, *inter alia*, the trial court "erred when it allowed into evidence extensive evidence of other crimes including video tapes of other people displaying firearms having nothing to do with the instant case in violation of rule 401 and 403."

¶ 35	At a February 2019 hearing, the trial court addressed defendant's motion for new trial. As to defendant's argument the court should not have allowed the other crimes evidence, the court explained the "evidence was pertinent to this case to explain the circumstances of why these individuals all got together back on the date of the offense and back on October 1st, 2017. It certainly helps explain the actions of those individuals in terms of why this offense *** occurred."

¶ 36	At that same hearing, the trial court conducted a sentencing hearing. The court imposed consecutive sentences of 30 years' imprisonment with a 25-year firearm enhancement for count I, 6 years' imprisonment with a 15-year firearm enhancement for count II, and 10 years' imprisonment for count V. Based on the nature of the offense, the court merged count III with count I. Defendant filed a timely motion to reconsider, which the court denied.

¶ 37	This appeal followed.

¶ 38	II. ANALYSIS

¶ 39     On appeal, defendant argues the trial court erred by improperly allowing the State to present evidence tying him to a gang. Specifically, defendant contends he was unfairly prejudiced when the State was allowed to introduce "photographs and videos of [defendant] *** posing with money and weapons, one photo of [defendant] throwing down a gang sign, testimony that [defendant] was part of a gang faction called 'The Money Team,' who would do anything to obtain money, and testimony that [defendant] was a drug dealer." The State responds, arguing the evidence was admissible as part of a continuing narrative of the events and provided a motive for the shooting.

¶ 40     Gang-related evidence is admissible where it is relevant to a disputed issue and its probative value is not substantially outweighed by its prejudicial effect. *People v. Johnson*, 208 Ill. 2d 53, 102, 803 N.E.2d 405, 434 (2003). Evidence of gang affiliation is relevant and admissible if it tends to make the existence of any consequential fact more or less probable than it would be without the evidence. *Johnson*, 208 Ill. 2d at 102. In addition, gang-related evidence is admissible, despite its prejudicial effect, to demonstrate a common purpose or design or to explain a motive for an otherwise inexplicable act. *People v. Patterson*, 154 Ill. 2d 414, 458, 610 N.E.2d 16, 36 (1992). We review a trial court's evidentiary rulings with respect to gang-related evidence for an abuse of discretion. *Johnson*, 208 Ill. 2d at 102. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable to the degree no reasonable person would agree with it. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 34, 117 N.E.3d 278.

¶ 41     Citing *People v. Pikes*, 2013 IL 115171, ¶¶ 20-27, 998 N.E.2d 1247, and *People v. Johnson*, 368 Ill. App. 3d 1146, 1155-56, 859 N.E.2d 290, 299-300 (2006), the State contends the surveillance video of the altercation at Walmart, the confrontation in the street on the day of the shooting, as well as the evidence concerning defendant's membership within TMT,

"provided a context and backdrop against which the instant offense was committed." We agree. In *Pikes*, our supreme court ruled earlier gang-related events were properly admitted as a continuing narrative to explain why the defendants attacked the victim. *Pikes*, 2013 IL 115171, ¶ 18. In *Johnson*, this court deemed other-crimes evidence admissible as a continuing narrative to show the defendant attacked the victims by mistake when he intended to target members of a different gang. This court held in *Johnson* the seemingly random attack would be completely inexplicable without gang evidence which tended to explain why the defendant on trial was motivated to commit the crimes he did. *Johnson*, 368 Ill. App. 3d at 1155. The same analysis applies to defendant's behavior in this case.

¶ 42 Although the issue in *Johnson* was whether other-crimes evidence committed by the defendant on trial would be admissible under the motive and continuing narrative exceptions to the prohibition against admitting such evidence, we note in *People v. Daniels*, 2016 IL App (4th) 140131, ¶¶ 75-82, 58 N.E.3d 902, this court held the continuing narrative exception for other-crimes evidence also applies to general relevancy considerations, as in the present case, not just when other-crimes evidence is at issue.

¶ 43 Here, the trial court properly admitted the gang-related evidence to establish motive for defendant's shooting of Pratt, and we conclude the evidence was relevant to show a continuing narrative of the events leading up to the shooting. The surveillance footage of the altercation at Walmart illustrated the ongoing issues between TMT, Pratt, and Rose, which originally concerned a separate dispute between Henson and Gardner. The evidence of those issues would help explain why another confrontation would break out at "3rd and College" before the shooting on October 1, 2017. Further, the evidence of defendant's membership within TMT, in addition to the Snapchat photographs depicting other members of the group involved in

the shooting, helped explain the actions of those individuals and why they came together on the date of the offense. The trial court gave an adequate explanation of the evaluation it conducted and the weighing of prejudice versus probative value. The prejudicial effect of this evidence did not substantially outweigh its probative value, and the trial court did not abuse its discretion by admitting it.

¶ 44　　　Even assuming, *arguendo*, the admission of any gang-related evidence was error, reversal does not automatically follow. "Evidentiary error becomes harmless where no reasonable probability exists that the trial court would have acquitted the defendant absent the error." *People v. Sheppard*, 2021 IL App (1st) 181613, ¶ 23. In other words, admission does not warrant reversal if the error is unlikely to have influenced the trier of fact. *People v. Pelo*, 404 Ill. App. 3d 839, 865, 942 N.E.2d 463, 486 (2010), *abrogated on other grounds by People v. Veach*, 2017 IL 120649, 89 N.E.3d 366.

¶ 45　　　Defendant attempts to persuade this court that without the Snapchat photographs, surveillance video footage, and any mention of gangs, the State's evidence with respect to the shooting is somehow improbable and riddled with doubt. However, we conclude the evidence against defendant was strong enough that had the "overly prejudicial, irrelevant gang evidence" been excluded from the trial, there is no reasonable probability the trial court would have acquitted defendant. In fact, the court specifically found "that drugs or just the activities of [TMT] *** was not directly involved." As the State points out, there was no dispute at trial defendant was involved in the shooting. After discussing the credibility of the witnesses, the court found Pratt's testimony credible, specifically noting Pratt's identification of everyone's position, his shooters, and "where he was shot by both of those individuals." The court further found Henson's testimony credible, where he reluctantly "put the gun in the Defendant's hand,"

despite having "a lot of loyalty for [defendant]." The trial court concluded there were two credible eyewitnesses to the shooting, both of whom identified defendant as one of the shooters. "It is well settled that '[t]he testimony of a single witness, if it is positive and the witness credible is sufficient to convict even though it is contradicted by the accused." *People v. Myles*, 2020 IL App (4th) 180652, ¶ 47 (quoting *People v. Hampton*, 44 Ill. 2d 41, 45, 253 N.E.2d 385, 387 (1969)). Their testimony—juxtaposed with defendant's incredible, self-serving testimony—does not create a reasonable probability the trial court would have acquitted defendant.

¶ 46                                 III. CONCLUSION

¶ 47            For the reasons stated, we affirm the trial court's judgment.

¶ 48            Affirmed.